# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 71

### APRIL TERM, A.D. 2014

### June 5, 2014

TIMOTHY S. TARVER and CAROLE A. TARVER,

Appellants
(Petitioners),

v.

CITY OF SHERIDAN BOARD OF ADJUSTMENTS, ROBERT L. BERNARD and BEVERLY D. BERNARD,

Appellees
(Respondents).

S-13-0171

*Appeal from the District Court of Sheridan County*
**The Honorable William J. Edelman, Judge**

*Representing Appellants:*
    Timothy S. Tarver, Sheridan, Wyoming.

*Representing Appellee City of Sheridan Board of Adjustments:*
    Kevin K. Kessner, Sheridan, Wyoming. No appearance.

*Representing Appellees Robert L. Bernard and Beverly D. Bernard:*
    Christopher M. Wages of Goddard, Wages & Vogel, Buffalo, Wyoming.

*Before KITE, C.J., and HILL, BURKE, DAVIS, and FOX, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KITE, Chief Justice.**

[¶1]    Timothy S. and Carole A. Tarver appeal from the district court's order affirming the City of Sheridan Board of Adjustments' (Board)[1] approval of Robert L. and Beverly D. Bernards' request for a special exemption to operate a bed and breakfast in an area zoned residential.  The Tarvers claim the Bernards' application was barred by *res judicata,* the Board was without authority to impose parking restrictions on the bed and breakfast, and the bed and breakfast did not meet the requirements for a special exemption to the zoning ordinances.

[¶2]    We conclude the Bernards were not barred from filing a second application for a special exemption, the Board acted within its authority when it conditioned the special exemption and its decision allowing the special exemption with parking conditions is supported by the record.  We, therefore, affirm.

## ISSUES

[¶3]    The salient issues presented in this case are:

    1.    Was the Bernards' second application for a special exemption barred by *res judicata* or collateral estoppel?

    2.    Did the Board act in excess of its authority by requiring parking restrictions for the Bernards' bed and breakfast?

    3.    Was the Board's decision that the Bernards were entitled to a special exemption for their bed and breakfast supported by substantial evidence and in accordance with the law?[2]

## FACTS

---

[1] The City of Sheridan did not appear in this appeal.

[2] The Bernards claim they are entitled to dismissal of the Tarvers' appeal or a summary affirmance of the district court's order because the Tarvers violated W.R.A.P. 7.01 by failing to attach a copy of the district court's decision to their opening brief.  Rule 7.01(j) requires the appellant to attach to the opening brief an appendix with copies of the final judgment or order appealed.  In an administrative case, the appellant appeals the district court's ruling, but we review the agency's order. *See Vogt v. State ex rel. Dept. of Transp.,* 2013 WY 123, ¶ 12, 310 P.3d 899, 904 (Wyo. 2013).  Thus, it is generally appropriate to attach both of those documents.  W.R.A.P. 1.03 gives this Court discretion to sanction any non-jurisdictional error in a brief as we deem appropriate.  In this case, the Tarvers' failure to attach a copy of the district court's decision does not create an undue burden, and we decline the Bernards' request to dismiss the appeal or summarily affirm the district court's decision.

1

[¶4]     The procedural history of this case is complex.  On March 24, 2011, the Bernards filed their first application for a special exemption to operate a bed and breakfast in an area of Sheridan, Wyoming which was zoned as an R-1 Residence District.  As part of the application process, they were required to give notice to neighbors within 300 feet of the boundary of their property.  The Tarvers live within the notification area and objected to the Bernards' application on several bases, including increased traffic and parking issues.

[¶5]     The Board held a hearing on April 14, 2011,[3] and approved the Bernards' application with several conditions, one being the Bernards had to submit an off-street parking plan that met the approval of city staff prior to operation of the bed and breakfast.  The Tarvers filed a petition for review with the district court.  While the appeal was pending, the Bernards worked with the city staff to secure approval of their parking plan.  After engaging an attorney and an engineer, the Bernards finally obtained the city staff's approval of their parking plan on December 16, 2011.

[¶6]     On January 13, 2012, the district court reversed the Board's approval of the Bernards' special exemption application, finding the Board had not followed the proper procedures in considering and granting the special exemption.  The Bernards did not appeal the district court's decision.

[¶7]     The Bernards filed a second application for a special exemption on January 25, 2012, and included the recently approved parking plan and a certificate of occupancy confirming the bed and breakfast complied with all code requirements.  The Tarvers again objected, claiming the Bernards' second application was barred by *res judicata* and, even if it was not barred, the application should be denied because of the deleterious effect of a bed and breakfast on the neighborhood.

---

[3] Although the Tarvers maintain  the hearing on the Bernards' first application was a contested case, it is not clear from the record whether that hearing was a public hearing or a contested case hearing.  See our discussion of the differences between the types of administrative hearings in *Northern Laramie Range Foundation v. Converse County Bd. of County Comm'rs,* 2012 WY 158, ¶¶ 10-20, 290 P.3d 1063, 1070-73 (Wyo. 2012).  *See also* Wyo. Stat. Ann. § 15-1-606 (indicating that boards of adjustment take action at "board meetings"); *Gilbert v. Bd. of County Comm'rs of Park County,* 2010 WY 68, 232 P.3d 17 (Wyo. 2010); *Donaghy v. Bd. of Adjustment of City of Green River,* 2002 WY 150, 55 P.3d 707 (Wyo. 2002); *Ebzery v. City of Sheridan,* 982 P.2d 1251 (Wyo. 1999); *Juroszek v. City of Sheridan Bd. of Adjustment,* 948 P.2d 1370 (Wyo. 1997); and *Cook v. Zoning Bd. of Adjustment for City of Laramie,* 776 P.2d 181 (Wyo. 1989) for examples of different types of hearings on zoning matters.

    The Board held another hearing on the Bernards' first application on August 11, 2011, after which it issued more detailed findings of fact and conclusions of law.  In its decision on the Tarvers' petition for review of the Board's decision on the Bernards' first application, the district court ruled that the Board did not have the authority to reconsider the April decision at the August hearing.  *See also Rosenberger v. City of Casper Bd. of Adjustment,* 765 P.2d 367 (Wyo. 1988) (discussing board's authority to rehear decision granting conditional use permit).  In any event, the hearing on the Bernards' second application, which is the subject of this appeal, was clearly a contested case hearing.

2

[¶8] The Board engaged a hearing officer to conduct a contested case hearing on the matter. The hearing officer apparently determined that the Bernards' application was not barred by *res judicata*,[4] and after a contested case hearing, the Board granted the Bernards' application on the condition that they record restrictive covenants incorporating the approved parking plan. The Tarvers filed another petition for review with the district court. The district court affirmed the Board's decision, and the Tarvers filed a timely notice of appeal with this Court.

## STANDARD OF REVIEW

[¶9] Our review of the Board's decision granting the Bernards a special exemption for operation of their bed and breakfast is governed by Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2013):

> (c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:
>
> (i) Compel agency action unlawfully withheld or unreasonably delayed; and
>
> (ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
>
> (A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
>
> (B) Contrary to constitutional right, power, privilege or immunity;
>
> (C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

---

[4] The record does not contain an order denying the Tarvers' motion to dismiss on the basis of *res judicata*; however, the circumstances indicate their motion was denied.

3

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Specific aspects of the standard of review will be set out in the discussion of the issues, below.

## DISCUSSION

### A. *Res Judicata/Collateral Estoppel*

[¶10] The application of preclusion doctrines such as *res judicata* and/or collateral estoppel involves questions of law. *Goodman v. Voss,* 2011 WY 33, ¶ 23, 248 P.3d 1120, 1127 (Wyo. 2011). We review an agency's conclusions of law *de novo* and affirm only if the agency's conclusions are in accordance with the law. *Moss v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2010 WY 66, ¶ 11, 232 P.3d 1, 4 (Wyo. 2010); *Dale v. S & S Builders, LLC,* 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo. 2008).

[¶11] In general, preclusion concepts apply to land use and zoning decisions. 101A C.J.S. *Zoning & Land Planning* § 279 (2014). *See also Hilltop Terrace Homeowner's Ass'n v. Island County,* 891 P.2d 29, 35 (Wash. 1995) (en banc); *Joelson v. City of Casper,* 676 P.2d 570 (Wyo. 1984). *Res judicata* bars litigation of previously litigated claims or causes of action; collateral estoppel prohibits re-litigation of formerly litigated issues. Given the limited authority of governmental agencies, collateral estoppel is often more appropriate for application in the administrative context. *Tenorio v. State ex rel. Wyo. Workers' Comp. Div.,* 931 P.2d 234, 238 (Wyo. 1997).

[¶12] The factors considered in applying collateral estoppel include:

(1) whether the issue decided in the prior adjudication was <u>identical</u> with the issue presented in the present action; (2) whether the prior adjudication resulted in a judgment on the merits; (3) whether the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication; and (4) whether the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior proceeding.

*Kahrs v. Bd. of Trustees for Platte County School Dist. No. 1,* 901 P.2d 404, 406 (Wyo. 1995), quoting *Slavens v. Bd. of County Comm'rs for Uinta County,* 854 P.2d 683, 686

4

(Wyo. 1993) (emphasis in original). The factors for application of *res judicata* are similar:

> Four factors are examined to determine whether the doctrine of res judicata applies: (1) identity in parties; (2) identity in subject matter; (3) the issues are the same and relate to the subject matter; and (4) the capacities of the persons are identical in reference to both the subject matter and the issues between them.

*Wyodak Resources Dev. Corp. v. Wyo. Dept. of Revenue,* 2002 WY 181, ¶ 11, 60 P.3d 129, 135 (Wyo. 2002), quoting *Eklund v. PRI Environmental, Inc.,* 2001 WY 55, ¶ 15, 25 P.3d 511, 517 (Wyo. 2001) (citation omitted). The two doctrines differ in that *res judicata* bars claims that could have been brought in the first action even if they were not. *Stoneking v. Wheatland Rural Elec. Ass'n,* 2003 WY 81, ¶ 11, 72 P.3d 272, 275-76 (Wyo. 2003).

[¶13] Although the decision of a zoning authority will generally be considered final and identical subsequent applications are barred under principles of *res judicata* and/or collateral estoppel, "*res judicata* will not prevent the approval of a second application where the second application presents substantial changes from the first application." 101A C.J.S. *Zoning & Land Planning* § 279. *See also Hilltop Terrace,* 891 P.2d at 35; *In re Woodstock Community Trust & Housing Vermont PRD,* 60 A.3d 686, 692 (Vt. 2012). Under those circumstances, the issues or subject matters presented in the two administrative actions are not identical.

[¶14] In the case at bar, the Board approved the first application, but its decision was reversed by the district court because the agency failed to comply with its own rules and procedures. The general issues in the two administrative actions were the same, i.e., applications seeking approval of a special exemption for operation of a bed and breakfast in a residential area. However, the second application differed from the first because it included an approved parking plan and a certificate of occupancy.

[¶15] In addition, the district court's reversal of the Board's decision on the Bernards' first application clearly was not a final judgment on the merits. The district court explained its initial decision as follows:

> 22. The City of Sheridan Code governing the Board provides that the Board has the authority "[t]o hear and decide special exemptions to the terms of this ordinance upon which the board is required to pass." Sheridan Municipal Code, Appendix A § 14.2. The city code further provides that

5

[i]n granting special exemptions, the board shall find the following:

(a)     The exemption requested is listed as an allowed special exemption within the zoning district in which the property is located.

(b)     The use is consistent with the goals, policies, and recommended future land use of the adopted master plan.

(c)     The granting of the exemption is in harmony with the general purposes and intent of the ordinance and will not be injurious to the neighborhood or otherwise detrimental to the public welfare.

23.     The Board failed to make two of the three findings required by the Sheridan Municipal Code when it issued its order granting the Bernards' exemption application. According to the meeting minutes, Mr. Tarver addressed the three findings that were required by the city code at the hearing.  Mr. Tarver indicated that he believed the first finding, that the exemption was an allowed exemption within its zoning district, had been met; however, Mr. Tarver also indicated that the second two findings needed to be addressed by the Board.  Despite that, the record only reflects that the Board made one of the required findings.

24.     The record before the Court is extremely limited.  The parties provided to the Court, and stipulated to the accuracy of, the minutes from the April 14, 2011 hearing; however, no verbatim record of the hearing was provided. Based on the limited record that is before the Court, there is no evidence that the Board made all three findings mandated by § 14.2.  The Board did find, as required under § 14.2(a), that the exemption requested was a special exemption allowed under the code.  Thereafter, however, the Board simply found that "granting the special exemption is not contrary to the public interest, and is in harmony with the spirit of the zoning ordinance, as long as the property owner complies with other aspects of the zoning ordinance."  One could only assume that finding was intended as a convenient shorthand for the proposition that "[t]he use is consistent with the goals, policies, and recommended future land use of the

6

adopted master plan" (the finding required by § 14.2(b)) and that "[t]he granting of the exemption is in harmony with the general purposes and intent of the ordinance and will not be injurious to the neighborhood or otherwise detrimental to the public welfare" (the finding required by § 14.2(c)). . . . The Board's finding falls short of the explicit requirements of the code. From the record before the Court, it is apparent that the Board failed to comply with the procedures required by the Sheridan Municipal Code because the Board failed to make the findings set forth in § 14.2 (b) and (c). Accordingly, the Board's decision cannot be upheld. [footnote 2]

[footnote 2 stated]: The Court further notes that given the limited record before the Court (including no verbatim record of the hearing, brief meeting minutes, and no other findings of fact or conclusions of law from the Board in support of its decision), there is no substantial evidence to support the three findings required by the municipal code. Because the Court concluded that the Board failed to comply with the procedures required by law, the court does not need to undertake a "substantial evidence" analysis, except to note that the lack of support in the record for the § 14.2 findings is a sufficient and independent ground for reversal.

. . . .

27. [T]he Board failed to follow its own procedure by failing to make the findings required by the Sheridan Municipal Code. Thus, the Board's decision is reversible under W.S. § 16-3-114(c)(ii)(D) for failing to follow the procedures prescribed by law. Furthermore, given the scant record before the Court, there is no substantial evidence in the record to support the Board's findings that the special exemption application should be granted. If a new application for a special exemption were filed, it should be clear from the record for future review that required findings are made and substantiated.

[¶16] The district court's decision was clearly based upon the Board's failure to follow the proper procedures and analyze the relevant legal questions. As such, the district court did not reach a final decision on the merits. The Tarvers argue, nonetheless, that the district court's mention of a lack of substantial evidence in the record finally decided the matter. The district court mentioned the inadequacy of the factual evidence in the record, but its focus was on the lack of record

7

altogether, rather than the lack of evidence within a sufficient record.

[¶17] It is also clear the district court did not consider its decision in that first appeal to be a final decision on the merits. In Paragraph 27 of its decision, it specifically mentioned the possibility of another application being filed and directed how the Board should analyze it if that occurred. Considering the Tarvers' argument that the Bernards were barred from bringing a second application by the earlier ruling, the district court stated:

> The Court finds that *res judicata* is not applicable in the present case. The Court finds that due to the Board's failure to follow its own rules and procedures during the first application process, the matter was not fully and fairly litigated in that proceeding. Penalizing an applicant for an agency's failure to adhere to its own rules and procedures would be patently unfair, and, the ends of justice require that the Bernards be allowed to reapply and have their application be administered in the proper manner.

[¶18] We agree with both of the district court's observations. The requisite issue was not fully and fairly litigated and there was no final decision on the merits of the first application. It would also be unfair to apply a preclusion doctrine against the Bernards under the circumstances of this case because the agency erred in applying its own rules and procedures. We have stated that one of the goals of *res judicata* is to "give, rather than deny, justice." *Eklund v. Farmers Ins. Exchange*, 2004 WY 24, ¶ 22, 86 P.3d 259, 265 (Wyo. 2004); *Cermak v. Great West Cas. Co.,* 2 P.3d 1047, 1054 (Wyo. 2000). The Bernards' second application for a special exemption was not barred by *res judicata* or collateral estoppel.

## B. The Board's Authority to Condition a Special Exemption

[¶19] The Tarvers maintain that the Board did not have authority to impose any type of parking restrictions on a property zoned R-1 Residence. This seems like a strange argument for them to make, considering one of their objections to the bed and breakfast was parking. However, their argument makes sense when considered in context. The Tarvers assert the city staff concluded that allowing the bed and breakfast without parking restrictions would be injurious to the neighborhood and R-1 zoning does not allow any parking restrictions for existing structures. Thus, they argue, the Board was without authority to impose parking restrictions and, without the restrictions, the Bernards could not meet the requirements for a special exemption.

[¶20] As we noted in the standard of review section, above, an agency's decision will be held unlawful and set aside if it is "[i]n excess of statutory jurisdiction, authority or

8

limitations or lacking statutory right." Section 16-3-114(c)(ii)(C). *See also Horse Creek Conservation Dist v. State ex rel. Wyo. Attorney General,* 2009 WY 143, ¶ 30, 221 P.3d 306, 316 (Wyo. 2009) (agencies can exercise only those powers authorized by statute). Interpretation of statutes, administrative regulations and municipal ordinances is a matter of law, which we review *de novo. J & T Properties, LLC v. Gallagher,* 2011 WY 112, 256 P.3d 522 (Wyo. 2011) (statutes); *Laramie County Sheriff's Dept. v. Cook,* 2012 WY 47, 272 P.3d 966 (Wyo. 2012) (administrative regulations); *Snake River Brewing Co. v. Town of Jackson,* 2002 WY 11, 39 P.3d 397 (Wyo. 2002) (municipal ordinances). To interpret statutory language:

> [T]he paramount consideration is to determine the legislature's intent, which must be ascertained initially and primarily from the words used in the statute. We look first to the plain and ordinary meaning of the words to determine if the statute is ambiguous. A statute is clear and unambiguous if its wording is such that reasonable persons are able to agree on its meaning with consistency and predictability. Conversely, a statute is ambiguous if it is found to be vague or uncertain and subject to varying interpretations. If we determine that a statute is clear and unambiguous, we give effect to the plain language of the statute.
>
> *Dorr v. Smith, Keller & Associates,* 2010 WY 120, ¶ 11, 238 P.3d 549, 552 (Wyo.2010) (citation omitted).

*Office of State Lands & Investments v. Mule Shoe Ranch, Inc.,* 2011 WY 68, ¶ 13, 252 P.3d 951, 954-55 (Wyo. 2011). All statutory provisions pertaining to the same subject are considered *in pari materia. Sorensen v. State Farm Auto. Ins. Co.,* 2010 WY 101, ¶ 13, 234 P.3d 1233, 1237 (Wyo. 2010).

[¶21] Wyoming statutes give the governing body of any city or town the right to regulate land use. Wyo. Stat. Ann. § 15-1-601 (LexisNexis 2013) states:

> (a) The governing body of any city or town, by ordinance, may:
> > (i) Regulate and restrict the:
> > (A) Height, number of stories and size of buildings and other structures;
> > (B) Percentage of lot that may be occupied;
> > (C) Size of yards, courts and other open spaces;
> > (D) Density of population; and
> > (E) Location and use of buildings, structures and land

9

for trade, industry, residence or other purposes.
        (ii) Establish setback building lines.

(b) The governing body may divide the city or town into districts of such number, shape and area as it deems necessary, and within those districts it may regulate and restrict the erection, construction, reconstruction, alteration, repair or use of buildings, structures or land.

(c) Regulations may differ from one (1) district to another but shall be uniform for each class or kind of buildings within a district.

(d) All regulations shall be made:
        (i) In accordance with a comprehensive plan and designed to:
                (A) Lessen congestion in the streets;
                (B) Secure safety from fire, panic and other dangers;
                (C) Promote health and general welfare;
                (D) Provide adequate light and air;
                (E) Prevent the overcrowding of land;
                (F) Avoid undue concentration of population; and
                (G) Facilitate adequate provisions for transportation, water, sewerage, schools, parks and other public requirements.
        (ii) With reasonable consideration, among other things, of the character of the district and its peculiar suitability for particular uses;
        (iii) With a view to conserving the value of buildings and encouraging the most appropriate use of land throughout the city or town; and
        (iv) With consideration given to the historic integrity of certain neighborhoods or districts and a view to preserving, rehabilitating and maintaining historic properties and encouraging compatible uses within the neighborhoods or districts, but no regulation made to carry out the purposes of this paragraph is valid to the extent it constitutes an unconstitutional taking without compensation.

[¶22]  Wyo. Stat. Ann. § 15-1-605 (LexisNexis 2013) directs the mayor, with the consent of the governing body, to appoint a board of adjustment to govern land use decisions. For our purposes, the board of adjustment has the statutory power to "[h]ear and decide special exemptions to the terms of the ordinance upon which the board is required to pass

10

under the ordinance[.]" Wyo. Stat. Ann. § 15-1-608(b)(i) (LexisNexis 2013). *See generally State of Wyo. ex rel. Epp v. Mayor of Dubois,* 894 P.2d 590, 596 (Wyo. 1995) (emphasizing the discretionary power of the board of adjustment in considering special exemption requests).

[¶23] Consistent with its statutory authority, the Sheridan City Council adopted zoning ordinances, appointed the Board, and adopted procedures for special exemptions. Sheridan Zoning Ord. § 4.1 pertains to the R-1 Residence District, within which the Bernard and Tarver properties are located:

### 4.1    R-1 Residence District.

A.    *Use Regulations.*  The following uses shall be permitted:
1.    One-family dwelling.
2.    Public park, playground and fair grounds.
3.    Public library, museum and community building.
4.    Public and private school, elementary and high, college.
5.    Church or other place of worship.  Parish house.
6.    Municipal, county, state or federal building, except for such uses as warehouse, garage or other uses customarily carried on as a business.
7.    Water supply reservoir, well, tower or filter bed.
8.    Telephone exchange where no public business office and no repair or storage facilities are maintained.
9.    Railway right of way not including railway yards.  Passenger station.
10.    Agriculture, gardening, and nursing for the propagation of plants.
11.    Home occupations as defined herein.
12.    Accessory buildings and uses customarily incidental to any of the above uses.

[¶24] Subsections B. and C. of § 4.1 set out height and area regulations for the R-1 Residence District.  Subsection D. delineates the permissible special exemptions:

D. Special Exemptions allowed within an R-1 Residence District:

1.    Bed and breakfast.
2.    Funeral home or mortuary.

11

3.      Hospital, sanitarium, or clinic, not including animal hospitals.

4.      Home for the children or aged.

5.      Offices offering professional services.

[¶25]  The Board considers applications for special exemptions to the zoning ordinances under Sheridan Zoning Ord. ¶ 14.2, which states in relevant part:

> 2 . . . In granting special exemptions, the board shall find the following:
>
> (a) The exemption requested is listed as an allowed special exemption within the zoning district in which the property is located.
> (b) The use is consistent with the goals, policies, and recommended future land use of the adopted master plan.
> (c) The granting of the exemption is in harmony with the general purposes and intent of the ordinance and will not be injurious to the neighborhood or otherwise detrimental to the public welfare.

[¶26]  The parties agree that there are no parking regulations specifically applicable to existing structures in the R-1 Residence District or to special exemptions in the R-1 district. The question, therefore, is whether the board has the power to regulate parking in order to ameliorate any injurious ramifications of a special exemption. The definition of "special exemption" in the Sheridan City Ordinances, which we read *in pari materia* with the list of special exemptions, provides an answer to this question.

> Special Exemption. A special exemption is a certain use as listed in Sec. 4.1 [the R-1 Residence District] . . . of this code which may be harmonious ***under special conditions*** and in specific locations within a zone, but may not be allowed under the general conditions of the zone as stated in this code. A special exemption must be authorized by the Board of Adjustment after appropriate findings.

Sheridan Zoning Ord. § 2 (revised by Sheridan Ord. No. 1812) (emphasis added). In *Northern Laramie,* ¶ 76, 290 P.3d at 1088, we stated that the agency had the power to impose special conditions on an industrial siting permit because the relevant statutes referenced such power. The same rationale applies here. Given that the ordinance defining special exemption refers to special conditions, the Board is entitled to impose appropriate conditions.

[¶27] Parking is undoubtedly something which is within the power of the City Council and Board of Adjustments to regulate. In fact, there are other provisions of the ordinances which specifically address parking requirements. *See, e.g.*, Sheridan Zoning Ord. §§ 10.16; Sheridan Ord. No. 826. It is true that the R-1 Residence District rules do not impose any parking requirements on existing structures. However, the very nature of a special exemption is to allow a use that technically is not permitted by the general zoning laws, provided the underlying goals of the zoning ordinances can be met with specific terms of use. In *Laramie River Cons. Council v. Industrial Siting Council,* 588 P.2d 1241, 1255 (Wyo. 1978), we approved the Industrial Siting Council's use of conditions in a permit as "an appropriate way to resolve certain areas in which absent such a commitment the [ISC] might be concerned as to the potential for injury to the inhabitants . . .". Given the ordinances allow special exemptions to be conditioned and parking is within the purview of zoning authorities, we conclude the Board had the power to impose parking restrictions on the Bernards' bed and breakfast as a condition of granting the special exemption.

### C.   Compliance with Requirements for Granting a Special Exemption

[¶28] The Tarvers claim the Board erred when it concluded the Bernards' application complied with the requirements for granting a special exemption. The substantial evidence standard of review applies to the agency's evidentiary determinations after a contested case hearing.

> When the burdened party prevailed before the agency, we will determine if substantial evidence exists to support the finding for that party by considering whether there is relevant evidence in the entire record which a reasonable mind might accept in support of the agency's conclusions. . . . If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test. Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it.

*Dale,* ¶ 22, 188 P.3d at 561. The agency's conclusions of law are, of course, subject to *de novo* review. *Id.,* ¶ 26, 188 P.3d at 561-62.

[¶29] As we stated in Paragraph 25, above, the Board must make three findings in order to grant a special exemption. The first requirement is that the exemption is allowed within the zoning district. Sheridan Zoning Ord. § 14.2(a). There is no question this

requirement was satisfied because a bed and breakfast is listed as an allowed special exemption in the R-1 Residence District. Sheridan Zoning Ord. § 4.1(D).

[¶30] The second requisite finding is "[t]he use is consistent with the goals, policies, and recommended future land use of the adopted master plan." Sheridan Zoning Ord. § 14.2(b). Wyo. Stat. Ann. § 15-1-501 *et seq.* (LexisNexis 2013) directs the planning commissions of municipalities to adopt master plans for the physical development of the municipalities. The master plans must include, among other things, zoning plans for regulation of the use of private and public structures. Wyo. Stat. Ann. § 15-1-503(a)(v) (LexisNexis 2013).

[¶31] The City of Sheridan adopted a master plan in 2001 entitled "Vision 2020 Sheridan County Growth Management Plan." The master plan includes three themes, each of which includes goals and implementation strategies. The three themes are:

- Theme 1. Maintain a community character that preserves the quality of life, values and traditions of the area.

- Theme 2. Enable planned growth throughout Sheridan County.

- Theme 3. Initiate guidelines and standards to achieve predictable and consistent land use and development.

[¶32] The Tarvers seem to concede that the Board's decision properly found that the Bernards' application met Theme 1, and they state in their brief that Theme 3 is not relevant to this dispute. They claim, however, there is no evidence the Bernards' bed and breakfast complies with Theme 2 of the master plan. They direct us to Goal B of Theme 2, which states:

> Goal B.  Plan  for  Orderly  Commercia[l] Development
>
> BACKGROUND
>
> It is recognized that as the population of Sheridan grows, additional commercial and industrial locations will be required. Commercial centers that are compatible with the character of the area are the desired configuration of new commercial development. . . .

The relevant implementation strategies state:

14

2.B.1 Access to commercial development should be carefully planned and controlled to make the most efficient use of public street and road improvements and reduce conflicts.

2.B.4 The encroachment of commercial establishments into residential areas and the growth of shallow strip commercial development should be discouraged, while recognizing that certain types of commercial uses must be located with good accessibility to major highways.

The Tarvers argue that because the "recommended future land use" in the master plan discourages the encroachment of commercial establishments in residential areas, the Bernards' bed and breakfast cannot be allowed in the area zoned as an R-1 Residence District.

[¶33] The Board responded to the Tarvers' argument in its order:

5. In arguing that a bed and breakfast is inconsistent with the master plan, the Tarvers[] argue that the master plan provides in relevant part that "The encroachment of commercial establishments into residential areas . . . should be discouraged" and that the Bernards' bed and breakfast is by definition "commercial development" because it is a building where services are delivered. The Board believes differently.

The master plan only provides that encroachment of commercial establishments should be "discouraged," not restricted or completely limited. By virtue of the fact that the ordinances allow limited exemptions to R-1 Residential District neighborhoods, the Board can only conclude that while commercial development in an R-1 area is discouraged, it is not [altogether] restricted and should be allowed in certain limited exceptions. It is also notable that, of the allowed exemptions in an R-1 Residential District (i.e. funeral home or mortuary, hospitals, sanitarium, or clinic, not including animal hospital, home for the children or aged, offices . . . offering professional services), a bed and breakfast is arguably the least commercial.

15

[¶34] Bed and breakfast is defined in the Sheridan ordinances as "[a] service of providing lodging with breakfast in exchange for payment in a residential dwelling." A bed and breakfast is unquestionably "commercial development" as that term is broadly defined in the master plan as "all land and buildings where products, goods, or services are delivered or rendered."

[¶35] As the Tarvers point out, the master plan states that commercial development in R-1 areas is discouraged. It does not, however, state that it is prohibited. Considering the ordinances as a whole and in harmony with one another as required by our statutory interpretation jurisprudence, it is clear the governing body did not intend to completely ban bed and breakfasts in residential areas. The ordinances would not have listed bed and breakfast as an allowed special exemption in the R-1 Residence District if it was prohibited. Moreover, the very definition of a bed and breakfast as "lodging" within a "residential dwelling" implies that it will be a type of commercial establishment located within a residential zoning district. The Tarvers' interpretation of the master plan's discouragement of commercial development in residential areas would convert the word "discourage" into "prohibit." That clearly was not the intent of the governing body when it provided a specific process for approval of bed and breakfasts in the R-1 Residence District.

[¶36] Robert Briggs, the planning director for the City of Sheridan, testified at the contested case hearing about how restricted commercial development may be allowed within an R-1 district while remaining consistent with the master plan:

> Q.     And is it correct to say that Vision 2020 is not a zoning document?
>
> A.     It is not a zoning document. It is a policy plan which makes recommendations regarding land use and development. It's a zoning document in the sense that, as all land use and master plans have a connection to the City's adopted zoning ordinance, that it should – that they should be consistent with each other and inform each other. The master plan is intended to create the philosophical basis or the community's – a reflection of the community and what they'd like to see expressed in the zoning ordinance.
>
> Q.     So I misspoke. Probably the more pointed question would be, it has no enforceable regulation in Vision 2020. Is that correct?
>
> A.     To my – no. It's a policy document of recommendations. And there are elements of the code which

16

require consistency with the plan. But in and of itself, it is not a regulatory document.

Q. Have you been to the Bernards' home, the subject of this application?

A. I have.

. . . .

Q. Aside from the site visit, you reviewed the Vision 2020 plan in conjunction with this application. Is that true?

A. That's correct.

Q. What other materials did you review? Did you review the application . . . ?

A. I did.

Q. What other materials did you review in forming your analysis of the special exemption application?

A. I reviewed municipal code, in particular, the sections relating to R-1 zoning, the Board of Adjustments' approval of special exemptions and the definitions portion of the zoning ordinance. I also referenced professional documents . . .
. . . .

Q. And as to Requirement Number 2, which we've discussed, the use is consistent with goals, policies and recommended future land use as adopted in Vision 2020, what was your analysis of this application for exemption in conjunction with your review of Vision 2020?

A. Reviewing a special exemption in consideration with this particular clause of City code is interesting in that special exemptions are actually conditional uses. So you will never find in an adopted plan – or, I would say it would be extremely rare to find in an adopted plan something that actually calls out an area, in particular for a specific special

17

exemption. And so my purpose in reviewing this section was to review the goals and objectives of that plan which are pertinent and also to look at -- Vision 2020 does not contain a future land use map, per se. What it does is it contains an inventory of existing land uses, and then those policy goals and recommendations revolve around development within those existing land use categories.

So I first conducted a review of the various goals and objectives and settled on the most relevant, at least in my mind, goal of that plan, which was to ensure the compatibility of new development and redevelopment with community values and existing development. And in looking at that, what I first did – what I did is recognizing that, by virtue of being listed as an allowed use in an R-1 zoning district, that meant that, at least in the mind of the crafters of our zoning ordinance, that a bed and breakfast, if operated properly, it's possible for that to be a use which is in harmony with the existing uses of an R-1 neighborhood.

And so that was kind of, I think, the general thrust of what I homed in on in terms of comparing it to the Vision 2020 plan.

Q. And so, essentially, it's allowed as an exemption in the zoning, and thus, you believe it was compatible with the zoning to have a bed and breakfast, compatible with the Vision 2020?

A. That's correct.

[¶37] Mr. Briggs noted the master plan did not include a future use map, but his testimony demonstrated that the city officials weighed the policies for community growth set forth in the master plan with the requested special exemption, keeping in mind that the use as a bed and breakfast would be outside the typical uses within the R-1 zoning district. He explained how the special exemption criteria worked together to ensure that any non-conforming use would not be detrimental to the neighborhood. Although he did not use the precise language of Theme 2 of the master plan, there is no question that he took into account the general discouragement of commercial development in residential areas.

[¶38] Recognizing that commercial development is out of the ordinary in residential areas, Mr. Briggs addressed the parking issues for the Bernards' bed and breakfast to

18

bring it into compliance with the third special exemption criterion, i.e. that it not be injurious to the neighborhood. The Bernards were agreeable to entering into restrictive covenants governing parking for their property, and the Board conditioned the special exemption upon the recording of appropriate restrictions.

[¶39] The Tarvers also expressed concern that allowing the Bernards a special exemption for a bed and breakfast would lead to "creeping commercialism" because the Board would not be able to deny future requests for bed and breakfast establishments or similar special exemptions. The Board addressed this argument as follows:

> 14. The Tarvers have argued that granting the Bernards' application for a special exemption will create a precedent for other commercial establishments to move into the R-1 Residential District where the Bernards' residence is located. This testimony is speculative and unsupported by any evidence contained in the record before this Board. The Board has discretion to grant or deny applications for special exemptions and will do so on a case-by-case basis given the merits of each application as they relate to the requirements for granting special exemptions. By granting the Bernards' application, the Board is in no way bound to grant future applications for a special exemption.

[¶40] Each application must meet all of the requirements set out in the ordinances for granting a special exemption. As we stated earlier, the Board has discretion in granting special exemptions. *See Epp,* 894 P.2d at 596. In conducting its discretionary analysis, the Board may find that the fact a special exemption has already been granted in a neighborhood weighs in favor of or against future applications for special exemptions. The Tarvers have not demonstrated how allowing one special exemption would change the nature of their neighborhood, leading to an influx of other nonconforming uses. In addition, Mr. Bernard testified about the efforts they had made to keep the commercial nature of their enterprise discrete, including inconspicuous signage, landscaping typical of the rest of the neighborhood, etc.

[¶41] We conclude the record contains relevant evidence which a reasonable mind might accept in support of the Board's determination that the Bernards' use of their property as a bed and breakfast met the standards set out in the relevant statutes and city ordinances. The Board's finding that the Bernards' bed and breakfast, with the parking restrictions, was consistent with the City's master plan is in accordance with law and supported by substantial evidence. The Board properly applied its discretion in concluding the Bernards were entitled to a special exemption, and we will not interfere with that decision.

19

[¶42] Affirmed.